IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGNERY PUBLISHING, INC.,

               Petitioner,

vs.                                                   CASE NO.: 1:08-cv-00709 (EGS)

RICHARD MINITER,

               Respondent.

REGNERY PUBLISHING, INC.'S OPPOSITION TO
TO RESPONDENT'S MOTION TO VACATE

I.     <u>Introduction</u>

       Respondent Richard Miniter's Motion to Vacate is his latest attempt to avoid compensating petitioner Regnery Publishing, Inc. for his breach of their two-book publishing contract ("Publishing Contract").  Regnery paid $263,333 in advances to Miniter per the agreement, but Miniter never delivered a second book and then refused to return the advance attributable to that book, forcing Regnery to initiate arbitration in April 2007.  Miniter has had a full and fair opportunity to present his case before the Arbitrator and to brief legal arguments in two post-hearing submissions.  On March 10, 2008, the Arbitrator issued an Award, finding that Miniter breached the contract and awarding Regnery $150,509.53 (net of set-offs) plus $8,918.75 in fees and expenses for the arbitration.

       Miniter's arguments for vacatur are deficient both factually and legally.  Miniter has not and cannot point to any fact or legal authority that establishes "evident partiality" by the Arbitrator or that he exceeded his powers that warrants vacatur under § 10 of the Federal Arbitration Act ("FAA") (9 U.S.C. § 10).  Contrary to Miniter's claims, his motion for recusal was not left "unresolved" but was addressed by the American Arbitration Association ("AAA")

in a written ruling.  Miniter also ignores the United States Supreme Court's recent decision

which narrows even further federal court review of arbitration awards and excludes so-called

"common law grounds" to vacate or modify an award.  His arguments relating to those grounds

and his reliance on prior case law, therefore, are misplaced.  Even if the Court were to consider

those non-statutory grounds, Miniter's claims nevertheless lack merit as he is seeking the Court

to substitute its judgment for that of the Arbitrator, which the law does not permit.

Accordingly, the Court should deny the Motion to Vacate and confirm the arbitration

award pursuant to § 9 of the FAA.

II.    Argument

A.    Section 10 of the Federal Arbitration Act Sets Forth the Exclusive Grounds for
       Vacatur of an Arbitration Award.

It is well established that "judicial review of an arbitration award is extremely limited."

*Int'l Thunderbird Gaming Corp. v. United Mexican States*, 473 F. Supp. 2d 80, 83 (D.D.C.

2007); *see also Three S Delaware, Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 527 (4th

Cir. 2007) ("the scope of judicial review for an arbitrator's decision is among the narrowest

known at law"); *Wise v. Wachovia Secs., L.L.C.*, 450 F.3d 265, 269 (7th Cir. 2006) (noting that

when parties agree to arbitration "they opt out of the court system").  The United States

Supreme Court recently addressed judicial review of arbitration awards in *Hall St. Assocs.,*

*L.L.C. v. Mattel, Inc.*, holding that the grounds for vacatur or modification of an arbitration

award set forth in §§ 10 and 11 of the FAA are exclusive.  552 U.S. ___, 128 S. Ct. 1396, 1401

(March 25, 2008).

The parties in *Hall Street* entered an arbitration agreement that provided for judicial

review of the award beyond the grounds delineated in §§ 9-11 of the FAA.  *Id*. at 1400-01.

However, the Supreme Court held that expanded judicial review is not permitted under the

FAA. *Id.* at 1404.  The Supreme Court viewed the statute "as substantiating a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway. " *Id.* at 1406.  It concluded, "[a]ny other reading opens the door to the full-bore legal and evidentiary appeals that 'can rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Id.* (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003)).

Since *Hall Street*, courts have not entertained grounds for vacatur, such as an arbitrator's "manifest disregard of law," that fall outside of § 10.  *See Ascension Orthopedics, Inc. v. Curasan*, 2008 U.S. Dist. LEXIS 39186, at *3 (S.D. Tex. May 14, 2008) ( "the Supreme Court's decision in *Hall Street* is unequivocal that the grounds upon which vacatur may be based as listed in § 10 are exclusive"); *Prime Therapeutics, L.L.C. v. Omnicare, Inc.*, 2008 U.S. Dist. LEXIS 41306, at *15 (D. Minn. May 21, 2008) ("courts can no longer vacate an arbitration award based on judicially-created grounds such as 'manifest disregard of the law'"); *Cuna Mut. Ins. Soc'y v. O.M. Fin. Assocs., L.L.P.*, 2008 U.S. Dist. LEXIS 25601, at *16 (W.D. Wisc. Mar. 28, 2008) ("The Supreme Court has recently held that '§§ 10 and 11 respectively provide the [Federal Arbitration Act's] exclusive grounds for expedited vacatur and modification.'").  Miniter, therefore, is limited to statutory grounds for vacatur under § 10.

B.    <u>Miniter Cannot Meet His "Heavy" Burden to Demonstrate that Vacatur Is Appropriate under § 10 of the Federal Arbitration Act.</u>

Miniter's claim for vacatur under § 10(a)(2) and (4) solely relates to a request for recusal of the Arbitrator that was denied by the AAA.  Miniter's recusal motion was frivolous on its face[1] but his claim here is <u>not</u> that the Arbitrator was biased and should have been

---

[1]  Miniter sought recusal allegedly because he believed that the Arbitrator may have been informed that he had not paid certain arbitration fees and expenses.  The issue was a moot

recused.  Rather, he argues only that the motion allegedly was not "addressed and resolved" by the Arbitrator, thereby leaving a "question of conflict of interest unresolved."  (Mot. to Vacate at 4.)  As the moving party, Miniter "bears the heavy burden of establishing that vacatur of the arbitration award is appropriate."  *Int'l Thunderbird,* 473 F .Supp. 2d at 83.  Miniter cannot meet his burden to demonstrate that vacatur is required under either § 10(a)(2) ("evident partiality or corruption in the arbitrators") or 10(a) (4) ("the arbitrators exceeded their powers or so imperfectly executed them. . .").

Significantly, the AAA considered and ruled on Miniter's request in a timely fashion.[2] As previously noted, the AAA denied the motion, stating: "After careful consideration of the parties' contentions, the Association has determined that John Keys will be reaffirmed as arbitrator in the above matter."  (*See* November 1, 2007 letter from Mark Just, attached hereto as Ex. 2.)  With the recusal motion resolved, Mr. Keys continued to serve in his capacity as Arbitrator, issuing an order on that same day, hearing oral arguments and deciding motions, presiding over the evidentiary hearing, and issuing a final award.  Miniter never once raised the issue that the recusal motion somehow was "unresolved" during the arbitration proceedings. He cannot point to a single fact that supports a finding of partiality or corruption on the Arbitrator's part, as required under § 10(a)(2).

Similarly, Miniter cannot meet his heavy burden of showing that the Arbitrator "exceeded his powers" or "so imperfectly executed them" under § 10(a)(4).  As the District of

---

point, however, because the arbitrator would have been apprised of that fact by Regnery at the hearing since Regnery paid some of the arbitration fees that were Miniter's responsibility and sought recovery of those payments as part of its award.  *See* Regnery's Opposition to Respondent's Motion to Recuse, attached hereto as Ex. 1.

[2]  Miniter filed his motion to recuse on October 26, 2007.  Regnery filed a response on October 29 and the AAA issued its ruling on November 1.

Columbia Circuit has held, "[t]he arbitrator need only grant the parties a fundamentally fair hearing." *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816 (D.C. Cir. 2007) (internal quotation marks and citation omitted). By his actions, the Arbitrator granted the parties a fundamentally fair hearing. For instance, he allowed Miniter to assert counterclaims even though the claims had been dismissed previously by the AAA because Miniter had failed to pay the filing fees. He also granted Miniter's request for postponement of the hearing date. There was no need to explicitly rule on the motion to recuse because the AAA already had done so and his actions were consistent with a finding that he, too, rejected the claims in Miniter's motion as unfounded. The Arbitrator certainly did not exceed his powers or imperfectly execute them.[3]

For these reasons, Miniter has not met his burden of establishing grounds for vacatur under § 10, the only permissible basis for vactur. Accordingly, "in the absence of a legal basis to vacate, this court has no discretion but to confirm the award." *Int'l Thunderbird*, 473 F. Supp. 2d at 83 (citing 9 U.S.C. § 9; *Bryson v. Gere*, 268 F. Supp. 2d 46, 54 (D.D.C 2003)).

     C.    <u>Even if Other Grounds Are Considered, Miniter Cannot Meet His Burden to Establish a Sufficient Basis for Vacatur.</u>

As noted above, the Supreme Court's ruling in *Hall Street* precludes this Court from vacating an award on grounds outside of § 10. However, even if the Court were to consider Miniter's claims under so-called "common law" grounds, such claims do not support vacatur. As the moving party, Miniter "bears the burden of demonstrating that the arbitration panel

---

[3] Miniter participated in the evidentiary hearing in January 2008 and, significantly, he did not object, or otherwise ask the Arbitrator to issue a separate ruling on the motion to recuse before proceeding with the hearing. Indeed, it was understood by all that the AAA had put the issue to rest in its November 1, 2007 ruling that Mr. Keys was "reaffirmed" as Arbitrator. Miniter does not argue here (nor can he) that the AAA's ruling is a basis for vacatur.

acted in manifest disregard of the law." *LaPrade v. Kidder, Peabody, & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001).  Miniter cannot meet this burden.

First, Miniter mischaracterizes the Award as including $25,000 for damages for breach of a separate agreement.  He argues that there was no such breach.  However, the agreement was made in connection with the Publishing Contract.  Thus, as recognized by the Arbitrator, the $25,000 Regnery paid to Miniter was recoverable as if it were an additional advance against royalties earned, a fact that is undisputed by the parties.  (*See* Award at 2, attached as Ex. B to Petition to Confirm Arbitration Award.)[4]  Because the parties agreed that the $25,000 relating to the separate contract was to be part of Miniter's total advance, Regnery was entitled to recover against it due to Miniter's breach, as the Arbitrator found.  Miniter points to no provision in any contract that precludes a finding that Regnery is entitled to do so.

Second, Miniter argues that the Arbitrator held that the Publishing Contract granted Regnery the right to force Miniter to produce a manuscript for *Hunting Zarqawi*, as the second book, even though he claims it was impossible for him to do so because he lacked the funds.  In fact, as is customary in book contracts, Miniter and Regnery agreed on an appropriate amount for the advance and schedule of payments.  Regnery adhered to the payment schedule.  The Arbitrator's ruling merely holds Miniter to the terms of the Publishing Contract.  The Award states:

> Miniter proposed *Zarquawi* to Regnery, advocated for it, and got Regnery interested in the project.  He later presented a budget for the project in the amount of $97,707 and informed Regnery that he could not do the book without getting that amount in advance, an advance not required by the Publishing Contract.  Regnery was under no contractual obligation to modify the terms of its existing agreement to advance more money to Miniter, nor was it unfair or in bad faith for it to refuse to do so.

---

[4]  *See also* Regnery's Post Hearing Brief at 2 (attached hereto as Ex. 3) and Regnery's Reply Brief at 4 (attached hereto as Ex. 4).

(Award at 4.)  The Arbitrator was not substituting his "own notion of right or wrong" but rather requiring Miniter to abide by the terms of the Publishing Contract.

Third, Miniter disagrees with certain interpretations of the Publishing Contract by the Arbitrator.  For instance, he claims that advances on "unearned royalties are not recoverable once a book is published" under the Publishing Contract.  (Mot. to Vacate at 6.)  The Arbitrator, however, considered and rejected this argument, noting that under the Publishing Contract such provisions only apply in certain circumstances, such as when a contract is terminated, as opposed to what has happened here, which was a breach by the author.  (Award at 3-4.)

Miniter also misstates the Arbitrator's ruling.  The Arbitrator did not hold that "royalties paid to Miniter for *Disinformation* [the first book] are recoverable due to his failure to provide a second book."  (Mot. to Vacate at 6.)  In fact, the Arbitrator specifically held that Miniter is entitled to all royalties on *Disinformation*, including all future royalties.  (*See* Award at 6 n.3.)  Regnery, on the other hand, is entitled to a partial return of the advance for Miniter's failure to deliver the second book.

Fourth, the Arbitrator's reasoned analysis establishes that the modest award for lost profits of $20,155 is not speculative.  The Arbitrator explicitly noted that recovery for lost profits was foreseeable by the parties because Miniter's previous contract with Regnery resulted in two bestsellers that generated profits for Regnery.  It was clear that "Regnery bargained for that benefit" in the current Publishing Contract.  (Award at 6-7.)  Likewise, the Arbitrator relied on well-established law in the District of Columbia that lost profits may be awarded based on estimates made to a "reasonable certainty."  (Award at 7, citing *Vector Realty Group, Inc. v. 711 Fourteenth Street, Inc.*, 659 A.2d 230, 234 (D.C. 1994)).  Thus, the

award for lost profits was entirely appropriate and therefore is not a ground for vacating the award.[5]

None of these complaints even approaches the high threshold of "manifest disregard for the law" to warrant vacatur of the Award. *See Lessin*, 481 F.3d at 821 ("manifest disregard of the law means more than error or misunderstanding with respect to the law"). While a federal court's "limited scope of judicial review does not extend to reweighing equities supported by the arbitration record," *id.,* that is precisely what Miniter has requested the Court to do here. Miniter may not agree with the Arbitrator's interpretation of the Publishing Contract and he may believe that the Arbitrator erred or misunderstood the law, but the law is clear that such disagreement, error or misunderstanding are not sufficient grounds to vacate an arbitration award.

III.    Conclusion

For the foregoing reasons, the Court should deny the Motion to Vacate and grant Regnery's Petition to Confirm Arbitration Award pursuant to 9 U.S.C. § 9.

Respectfully submitted,

_____/s/ *Mark I. Bailen*_____
Mark I. Bailen (459623)
Baker & Hostetler, LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
Email: *mbailen@bakerlaw.com*

*Attorneys for Petitioner Regnery Publishing, Inc.*

_____

[5]  Miniter has not sought modification of the Award under § 11 of the FAA.

AMERICAN ARBITRATION ASSOCIATION
Washington, D.C.

| | | |
|---|---|---|
| REGNERY PUBLISHING, INC., | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | | |
| v. | ) | Claim No. 16 459 00290 07 |
| | ) | |
| RICHARD MINITER, | ) | |
| | ) | |
| Respondent. | ) | |

REGNERY PUBLISHING, INC.'S
OPPOSITION TO RESPONDENT'S MOTION TO RECUSE

Claimant Regnery Publishing, Inc. opposes Respondent Richard Miniter's Motion to

Recuse and states as follows:

1.      The claim that an arbitrator should not be advised of a party's delinquency in

paying his fees lest it create "an intolerable appearance of prejudice" is simply not contemplated

under the Rules of the American Arbitration Association ("AAA"), federal or District of

Columbia arbitration law, or common sense.  As the motion to recuse is completely without

merit, it appears merely to be Mr. Miniter's latest attempt to delay this proceeding which is set

for hearing on November 5, 2007.

2.      The AAA Commercial Arbitration Rules specifically provide that the arbitrator

would be made aware of the failure to make the arbitrator's fee deposit, as the rule enables the

arbitrator to suspend or terminate the proceedings in the event no such payment is made.  R-54.

Miniter apparently failed to make any of the arbitrator deposit payments, dating back to August.

Even if the Case Administrator informed the Arbitrator of Miniter's delinquency,[1] the Arbitrator

---

[1]  There is nothing to suggest that the Case Administrator actually informed the Arbitrator of
which party was in arrears, and Mr. Miniter's belief regarding that fact is pure speculation.

would certainly have learned of Miniter's delinquency at the hearing if not sooner, as Regnery is including the amounts it paid on behalf of Miniter in connection with this proceeding in its award request.[2]

3.     The statutory authority cited by Miniter does not support vacating an award in these circumstances, nor does any other authority under federal or District of Columbia law.  The claim that the arbitrator cannot discuss case administration issues with the AAA's case administrator is patently absurd.  It is akin to prohibiting a judge from discussing a case with the clerk of court.

4.     Moreover, there has been no harm or prejudice to Miniter.  The Arbitrator did not dismiss the counterclaims or take any other action, adverse or otherwise to Miniter.  At most, the Arbitrator merely learned of an issue that would have been presented to him in any event within a short period.  There is simply nothing to suggest that the Arbitrator is now incapable of rendering a fair, neutral and just award in this matter.

5.     Regnery, on the other hand, would be prejudiced by removal of the Arbitrator at this eleventh hour as it would inevitably lead to significant delay in these proceedings.

WHEREFORE, the Arbitrator should deny the Motion to Recuse.

---

[2]   Indeed, it would have been sooner as Regnery intends to serve today a motion to strike Miniter's counterclaims on the grounds that he has abandoned the claims by failing to (1) produce any documents in response to Regnery's document requests; (2) exchange any exhibits or identify any witnesses by the deadline set in the Scheduling Order in this case; and (3) pay the requisite fees as required under the AAA rules.

BAKER & HOSTETLER LLP


By:      */s/  Mark I. Bailen*
Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave, NW
Suite 1100
Washington D.C. 20036
(202) 861-1500
Fax (202) 861-1783

*Attorneys for Claimant*
*Regnery Publishing, Inc*


<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing Opposition to Motion to Recuse was served via email on the following counsel on this 29th day of October, 2007.

John M. Shoreman, Esq.
McFadden & Shoreman
1420 New York Avenue, NW
7th Floor
Washington, D.C. 20005


*/s/ Mark I. Bailen*

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Southeast Case Management Center*
John M. Bishop
Vice President
Linda Beyea
Assistant Vice President

November 1, 2007

2200 Century Parkway, Suite 300, Atlanta, GA 30345
telephone: 404-325-0101 facsimile: 404-325-8034
internet: http://www.adr.org/

<u>**VIA FACSIMILE**</u>

Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

John M. Shoreman, Esq.
McFadden & Shoreman,L.L.C.
1420 New York Avenue, N.W., 7th Floor
Washington, DC 20005

Re: 16 143 00290 07
    Regnery Publishing, Inc.
    and
    Richard Miniter

**\*\*CORRECTED LETTER\*\***

Dear Parties:

After careful consideration of the parties' contentions, the Association has determined that John Keys will be reaffirmed as an arbitrator in the above matter.

This will serve as a reminder that the hearinf in the above matter is scheduled to commence on November 5, 2007 at 10:00 AM at Mr. Bailen's office.

Sincerely,

*/s/ Mark Just*

Mark Just
Case Manager
866 743 4446
JustM@adr.org

*Supervisor Information: Rebecca M. Rau, 866 888 5293, raur@adr.org*

Encl.

AMERICAN ARBITRATION ASSOCIATION
Washington, D.C.

| | | |
|---|---|---|
| REGNERY PUBLISHING, INC., | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | | |
| v. | ) | Claim No. 16 143 00290 07 |
| | ) | |
| RICHARD MINITER, | ) | |
| | ) | |
| Respondent. | ) | |

<u>REGNERY PUBLISHING, INC.'S POST-HEARING BRIEF</u>

This case is a straightforward breach of contract action.  The evidence presented at the hearing on January 15, 2008, clearly establishes that Richard Miniter and Regnery Publishing, Inc. entered into a binding contract on February 14, 2005 (the "Publishing Contract) in which Miniter assigned to Regnery all right, title, and interest to publish two books to be authored by Miniter.  It is undisputed that Regnery performed under the contract by advancing Miniter all amounts due to him (as well as additional sums), publishing the first book, and agreeing to publish Miniter's proposed book on Zarqawi for the second.  It is further undisputed that Miniter never produced a second manuscript for publication.  At the hearing, Miniter attempted to offer various excuses and rationalizations for his failure to provide the manuscript, but none justify his lack of performance under the agreement.

In light of Miniter's breach, Regnery is entitled to a refund of the advance paid to Miniter that is attributable to the second book, as well as lost profits that could have been earned by Regnery had Miniter completed the second manuscript.  In addition, Regnery is entitled to lost profits for a separate and distinct literary work that is scheduled to be published by another publisher, BenBella Books, because Miniter failed to provide Regnery the first opportunity to read and consider for publication this new book, as required under the option clause of the

Publishing Contract.  Finally, to the extent the counterclaims that were withdrawn are considered

dismissed without prejudice, Regnery seeks its attorneys' fees and costs related to defending the

counterclaims.

I.     <u>STATEMENT OF FACTS</u>

A.     <u>Breach of Contract</u>

Although the parties have differing views of various events that transpired over the last

two years, the material facts that establish Miniter's breach of the Publishing Contract are

undisputed.  Namely, it is undisputed that:

- the Publishing Contract is a valid agreement between the parties.  Miniter acknowledged that he signed the agreement and that he was required under the agreement to produce two manuscripts for publication.  Miniter further acknowledged that he received $263,333 in payments from Regnery, over two thirds of the original amount of the advance for two books.  Miniter agreed that the $25,000 that he received under the June 2006 Publicity Agreement (Ex. 2) is to be considered an additional advance.

- Miniter produced a manuscript for the first book ("*Disinformation*"), which Regnery published, but Miniter never produced a manuscript for the second book.

- After a meeting in late January 2006, Regnery accepted Miniter's proposal for a second book relating to Zarqawi.

- Miniter subsequently demanded an additional payment of approximately $97,000 to complete the Zarqawi book.  Miniter acknowledged that he demanded payment to be made by Regnery many months before any payments were required under the Publishing Contract.[1]

- Regnery declined to amend the Publishing Contract to add or accelerate payment of $97,000.  Rather, as Ms. Ross testified, the contract clearly states that Miniter would receive the remaining amount of the advance upon Regnery's acceptance of the second manuscript.  Ex. 1, ¶ 2(b).  *See also* Ex. 29.

---

[1]  Although the record is not clear as to whether Miniter demanded the $97,000 payment as an additional advance against royalties or as an accelerated payment of the remaining $116,667 advance due under the contract at the time the second manuscript would have been accepted by Regnery, it does not affect the analysis of whether Miniter is in breach.  Either way, Miniter has acknowledged that the terms of the contract did not entitle him to any payments from Regnery until the second manuscript was completed.

Miniter has not disputed any of the material facts establishing his breach of contract.  In fact, the evidence reveals that Miniter's own agent, Mel Berger, negotiated a compromise deal with Regnery whereby Miniter would return $83,333 of the amounts advanced to him due to his failure to produce the second manuscript, essentially acknowledging that a partial return of the advance was required.  *See* Exs. 30-42.  Incredibly, Miniter claimed that Mr. Berger acted "ultra vires" and without his consent, even though the documents produced in discovery provide no support for such a claim and both Ms. Ross and Mr. Carneal testified that, throughout their negotiations with Mr. Berger, they believed that he was acting with Miniter's full knowledge and approval, as Berger had done in all previous negotiations and communications relating to Miniter as well as many other authors over the years.  Nevertheless, even if Miniter never approved the agreement for the return of the $83,333, that does not relieve him of his obligations under the Publishing Contract.

       B.     <u>Breach of Contract - Option Clause</u>

It is further undisputed that Miniter did not approach Regnery with a book proposal for the book that Miniter will be publishing with Benbella Books in March 2008.  Under paragraph 13 of the Publishing Contract, Regnery "shall have the first opportunity to read and consider for publication the manuscript or detailed outline of Author's next literary work suitable for publication in book form."

       C.     <u>Damages</u>

The evidence at the hearing established that Regnery paid Miniter a total of $263,333 under the Publishing Contract and related publicity agreement and that Miniter earned $116,433 in royalties for the first book, *Disinformation*.  (Exs. 60, 62.)  Ms. Ross testified that Regnery was willing to pay a substantial, six-figure advance under the Publishing Contract specifically

because it was a two-book deal.  She explained how the publication of two books spreads the risk

for Regnery and that if one book underperforms (as was the case with *Disinformation*), Regnery

could make up the difference with a stronger second book.  Miniter's failure to produce a second

manuscript effectively deprived Regnery the ability to recover its outlays through the publication

of the second book.  The evidence further revealed that Miniter's books under the earlier 2003

contract were profitable for Regnery and that *Disinformation*, although not as lucrative, earned a

small profit.  Regnery's average profit for all three books was $167,055.  Ex. 62.

## II.    LEGAL ARGUMENT

### A.    Miniter Breached the Publishing Contract

Under District of Columbia law,[2] "[b]reach is an unjustified failure to perform . . .what is

promised in a contract entitling the injured party to damages."  *Fowler v. A & A Co.*, 262 A.2d

344, 347 (D.C. 1970) (internal quotation omitted).  Here, it is undisputed that the Publishing

Contract is a valid contract between the parties that required Regnery to make certain payments

to Miniter based on a predetermined schedule and for Miniter to submit to Regnery manuscripts

for two books.  Regnery performed under the contract by advancing $263,333 to Miniter as part

of the two-book deal, and by publishing the first of the two books, *Disinformation*.  Miniter

provided Regnery with the first manuscript but never produced a manuscript for a second book.

He also refused to follow through with a "buy out" compromise whereby Regnery would have

agreed to relieve Miniter of his obligation to produce the second manuscript in exchange for

return of $83,333 of the advance.  Miniter has provided no legitimate basis for failing to produce

the second manuscript or return the advance.

---

[2]  Pursuant to paragraph 14 of the Publishing Contract, this arbitration is governed by the laws of
the District of Columbia.

Miniter's various excuses lack substance, and in any event, are legally immaterial.  For instance, Miniter claimed that he never received a "written marketing plan" with respect to the first book under the Publishing Contract.  However, the evidence shows that Miniter's late completion of the manuscript affected Regnery's ability to provide a written plan.  The evidence further shows that Regnery had marketing plans for *Disinformation* in place and implemented. Indeed, Miniter never made any requests in writing (by email, letter or otherwise) for the marketing plan.  Ms. Ross testified that Miniter never brought this issue to Regnery's attention.

While Miniter may not have agreed with every aspect of Regnery's marketing and promotion of *Disinformation*, that does not amount to a "breach" by Regnery that justifies refusal to produce a second manuscript.  Under District of Columbia law, "only where the breach is material - that is, receiving something 'substantially less or different from that for which he bargained' - is one able to elect the alternative rights and the remedies available to him." *Fowler,* 262 A.2d at 347 (quoting Simpson, Contracts, § 159 (2d ed. 1965)); *see Travis v. Travis,* 203 A.2d 173, 176 (D.C. 1964) ("Not every breach of an agreement or failure by one party exactly to perform entitles the other to rescind or avoid performance").  Miniter is not entitled to "avoid performance" because he did not receive anything "substantially less" than for which he bargained.  The key components of the Publishing Contract – that Regnery pay Miniter a six-figure advance and publish manuscripts that he authors –were fulfilled by Regnery.  Miniter "cannot accept the benefits [of the contract] while he shirks the burdens."  *Id.* at 175-76.[3]

For the same reasons, Miniter's claim that Regnery did not provide him weekly Bookscan

---

[3] As the District of Columbia Court of Appeals noted, "the act upon which the person bases his right to no longer be bound by the contract must involve an unqualified refusal by the other party to perform . . . . A mere dispute as to the manner of the performance, a misunderstanding as to the manner in which it shall be performed, not persisted in, does not justify a rescission by the other party."  *Travis*, 203 A.2d at 176 (internal quotation omitted).

reports does not justify his failure to perform under the contract.  Miniter admitted that he could not point to any written correspondence evidencing that he ever requested such reports.  In any event, whether or not Regnery provided weekly reports of the book sales (which contained similar information to what Miniter did receive in his royalty statements from Regnery) is immaterial and no justification for avoiding performance under the Publishing Contract.

To the extent that Miniter claims that Regnery "cancelled" the contract (by declining to pay him an additional $97,0000 in January 2006 and instead insisting that both parties follow the contractual schedule of payments), there is simply no evidence to support such an assertion. Miniter cannot point to any correspondence or other document indicating that the contract was cancelled and Ms. Ross specifically testified that Regnery did not cancel the agreement.  As her March 30, 2006 letter sets forth, Regnery had hoped that Miniter would "deliver the Zarqawi book, on time, as promised, agreed and stipulated in our contract."  Ex. 29.  If Miniter delivered the Zarqawi book, the letter continued, Regnery "would be happy to publish it."  On the other hand, if Miniter "requires additional cash in order to produce the book, or he no longer wishes to work with Regnery . . . then we would be willing to allow another publisher to buy out the second book in his two-book contract."  The evidence shows that Miniter's agent Mel Berger pursued the alternative avenue of seeking a "buy out" from another publisher for the second book.  *See* Exs. 30-42.  There was no cancellation of the contract that would entitle Miniter to keep the advance attributable to a second book that was never completed.[4]

---

[4]  Even if the contract were somehow cancelled or nullified, Regnery nevertheless would be entitled to its claim for unjust enrichment (Count II of Demand for Arbitration). *4934, Inc. v. District of Columbia Dept. of Employment Services,* 605 A.2d 50, 55  (D.C. 1992) ("Unjust enrichment occurs when a person retains a benefit (usually money) which in justice and equity belongs to another.")  Principles of justice and equity dictate that Miniter is not entitled to retain the portion of the advance attributable to the second book that he never completed.

B.    Regnery's Claim for Damages is Reasonable and Compensates Regnery for
Miniter's Breach

The proper measure of compensatory damages for breach of contract "should be such as

may fairly and reasonably be considered either arising naturally, i. e., according to the usual

course of things from such breach of contract itself, or such as may reasonably be supposed to

have been in the contemplation of both parties at the time they made the contract, as the probable

result of the breach of it." *Fowler*, 262 A.2d at 349 (citing *Hadley v. Baxendale*, 9 Exch. 341

(1854)).  "'Contract damages ... are intended to give the [injured party] the benefit of his bargain

by awarding him a sum of money that will, to the extent possible, put him in as good a position

as he would have been in had the contract been performed.'" *Vector Realty Group, Inc. v. 711*

*Fourteenth Street, Inc.*, 659 A.2d 230, 234 n.8 (D.C. 1994) (quoting Restatement (Second) of

Contracts § 347 comment a (1981)).

For its damages, Regnery seeks: (1) return of the advance attributable to the second book

since Miniter did not perform his contractual obligation to earn that advance; and (2) profits that

Regnery could reasonably expect to have earned had Miniter delivered the second book.

Regnery paid Miniter a total advance of $263,333.  He has earned royalties on

*Disinformation* amounting to $116,433.04.  Regnery seeks to be repaid the difference between

the amount paid as an advance and the actual royalties earned (the "unearned advance"), which is

$146,899.96.  Had Miniter fully performed under the contract, Regnery would have been in the

far superior position of collecting revenue from two sources (both books) in its efforts to recover

against the advance.  As Ms. Ross testified, Regnery can spread its risk (of fronting several

hundred thousand dollars to an author) in a two-book deal that it would not be able to do in a

one-book deal.  Miniter unilaterally and without justification converted the parties' two-book

deal into a one-book deal.  For Regnery to be in "as good a position as it would have been," the

entire unearned balance of $146,899.96 should be awarded to Regnery.

At the very least, as even Mr. Berger, Miniter's own agent appears to agree, Regnery is entitled to a minimum of $83,333, representing the difference between the $263,333 advanced to Miniter and the $180,000 allocated to royalty distribution for *Disinformation* in paragraph 2(b) of the Publishing Contract. Of course, it was not contemplated by the parties that the $180,000 figure would limit compensation to Regnery in the event of the author's breach in producing the second book in a two-book deal. As Mr. Carneal testified, the $83,333 figure in the "buy out" agreement was reached as part of a compromise Regnery was willing to make at the time with Miniter.[5] Indeed, the return of the entire unearned advance ($146,899.96) would more justly compensate Regnery for the money it paid Miniter and cannot now otherwise recover.

In addition, Regnery is entitled to lost profits. Recovery of damages in a breach of contract action "may also extend to loss of business income or profits suffered through collateral contracts or from collateral sources if such damages were otherwise foreseeable and proved with certainty." *Sears, Roebuck & Co. v. Goudie*, 290 A.2d 826, 832 (D.C. 1972) (citing 22 Am.Jur.2d Damages §§ 61-62 (1965)). "[M]athematical precision" is not necessary. *Id.* at 833. "A plaintiff need prove damages only with reasonable certainty." *Keefer v. Keefer & Johnson, Inc.*, 361 A.2d 172, 176 n.7 (D.C. 1976). "While an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on *relevant data*." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 (D.C. 1981) (emphasis added). "Probable and inferential considerations as well as direct and positive proof may provide the basis for an award." *Id.* "Damages are not rendered uncertain because they cannot be calculated with absolute exactness.

---

[5] That compromise certainly never contemplated the cost in time and expense of a year-long arbitration battle.

It is sufficient if a reasonable basis of computation is afforded, although the result be only

approximate." *District News Co. v. Goldberg*,  107 A.2d 375, 377 (D.C. 1954).

Regnery's lost profits claim is based on "relevant data" – records of profits based on

three other books written by Miniter and published by Regnery. *See* Ex. 62.  The average profit

from those three books – $167,055 – is a "just and reasonable estimate" of the lost profits for the

never-completed book.

C.     <u>Miniter Failed to Adhere to the Option Clause</u>

Miniter does not dispute that he is publishing a book with BenBella Books.  In fact, he

produced his contract confirming this fact.  Ex. O.  Nor does he dispute that he did not provide

Regnery its option of first refusal under paragraph 13 of the Publishing Contract.  As the contract

was never cancelled, Miniter has provided no justification for failing to comply with the option

clause.  His argument that his BenBella contract is not very lucrative is irrelevant to the fact that

he denied Regnery the opportunity to publish his next work.  Based on Regnery's track record of

publishing Miniter's books, they are entitled to the lost profits that would have been earned on a

book by Miniter.  As set forth above in Section B, a reasonable estimate of those lost profits

amounts to $167,055.

D.     <u>Regnery Should Be Awarded Fees and Costs of Defending Counterclaims if
       Counterclaims Are Not Dismissed With Prejudice.</u>

For the reasons set forth in Regnery's Motion for Entry of Dismissal of Counterclaims

with Prejudice, Regnery believes the counterclaims should be dismissed with prejudice.  To the

extent the counterclaims are considered withdrawn without prejudice, Regnery is entitled to its

attorneys fees and costs incurred in defending the withdrawn claims.  *See GAF Corp. v.

Transamerica Ins. Co*., 665 F.2d 364, 367 (D.C. Cir. 1981) ("Attorneys' fees and costs are

commonly awarded as one such 'term and condition' for a voluntary dismissal.").  Attached as

Exhibit A hereto is a breakdown of the fees and costs related to defending the counterclaims, with supporting invoices.  The total fees and expenses for the counterclaims is $15,875.55.[6]

III.   <u>CONCLUSION</u>

For the foregoing reasons and the reasons raised at the January 15, 2008 hearing and prior briefing in this matter, Regnery respectfully requests a finding of breach of contract by Miniter and an award of $496,884.55 representing $146,899.96 of unearned advance, $167,055 for lost profits attributable to the second book of the Publishing Contract, $167,055 for lost profits attributable to the BenBella book, and $15,875.55 for fees and expenses relating to the withdrawn counterclaims, plus all fees and expenses paid by Regnery to the American Arbitration Association and prejudgment interest.

BAKER & HOSTETLER LLP


By:    */s/  Mark I. Bailen*
Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave, NW, Suite 1100
Washington D.C. 20036
(202) 861-1500
Fax (202) 861-1783

*Attorneys for Claimant*
*Regnery Publishing, Inc.*

---

[6] The fees and expenses fall into three main categories:  fees relating to (1) briefing of the various motions pertaining to the counterclaims; (2) preparation of a defense to the counterclaims; and (3) retention of the expert witness, Ms. Cathy Hemming, who was retained solely to address the issues raised by the counterclaims.  Where applicable, attorney time was reduced to represent only such time addressing counterclaim issues.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Regnery Publishing, Inc.'s Post Hearing

Brief was served via email on the following counsel on this 1st day of February, 2008.

John M. Shoreman, Esq.
McFadden & Shoreman
1420 New York Avenue, NW
7th Floor
Washington, D.C. 20005


_____/s/ Mark I. Bailen_____

AMERICAN ARBITRATION ASSOCIATION
Washington, D.C.

| | | |
|---|---|---|
| REGNERY PUBLISHING, INC., | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | | |
| v. | ) | Claim No. 16 143 00290 07 |
| | ) | |
| RICHARD MINITER, | ) | |
| | ) | |
| Respondent. | ) | |

REGNERY PUBLISHING, INC.'S REPLY BRIEF

In an attempt to justify his non-performance under the Publishing Contract, Miniter's

Post-Hearing Brief asserts arguments that lack merit both legally and factually. As shown

below, none of the arguments affects the finding that Miniter breached the Publishing Contract.

I.      Miniter's Reliance on Subparagraph 9(e) Is Misplaced

Paragraph 9 of the Publishing Contract is entitled "Right To Cancel." Ex. 1.

Subparagraphs (a) – (d) each address different scenarios whereby either party may have the right

to terminate or cancel the contract. For instance, subparagraph 9(b) states that if Regnery

determines that Miniter is in breach of any of the Authors' warranties set forth in paragraph 5 of

the contract, Regnery may terminate the contract by written notice to Miniter. If Miniter does

not cure the breach within 30 days, the contract is deemed null and void and the "Author shall

return all sums previously paid but unearned to Publisher." Regnery has not asserted in this

action that Miniter is in breach of any of the warranties set forth in paragraph 5, nor are there any

claims (by either party) that subparagraphs (9)(a), (c) or (d) apply. Because subparagraph 9(e),

by its plain language, applies only "[i]n the event of a termination by either party under this

paragraph," and Regnery has not terminated the contract under paragraph 9, subparagraph 9(e)

does not limit Regnery's relief. Indeed, the language in subparagraph 9(e) (regarding return of

advanced royalties prior to "publication") applies only to a breach of the "Author's warranties as set forth in this agreement." This action concerns Miniter's failure to perform under the Publishing Contract, not a breach of one of the "Author's warranties." [1]

Even if subparagraph 9(e) somehow applies in this case – which it does not – Miniter's interpretation that publication of *Disinformation* "cuts-off" any rights for Regnery is unreasonable and not supported by the plain language of the agreement. The Publishing Contract is a two-book deal and this section does not refer only to publication of the first book. Rather, it concerns return of the advanced royalties prior to a book's publication and, as there has been no publication of a second book, it is clear that advances attributable to the unpublished second book would be recoverable. Otherwise, the contract would have the perverse and illogical result of allowing an author to keep advances for a book he never completed. Under Miniter's misguided theory, the entire advance is now attributable to the first book because he did not complete a second manuscript. There is no support for that interpretation.

    II.    <u>Regnery Did Not Prevent Publication of the Second Book</u>

It is undisputed that, after Miniter presented his proposal for a book on Zarqawi to Regnery's acquisition committee, Regnery informed Miniter that it accepted his proposal and would publish that book. As Ms. Ross' March 30, 2006 letter makes clear, Regnery would be "happy to publish" the Zarqawi book. The only thing that prevented publication was Miniter's demand that he receive additional payment (approximately $97,000) prior to delivery of the manuscript. As Miniter admits, this payment would have been extra-contractual, requiring a modification of his "financial arrangements with Regnery." Miniter Br. at 3. Of course, in the

---

[1] Moreover, Regnery did not "cancel" or "terminate" the contract. Marji Ross' March 30, 2006 letter clearly sets forth that Regnery was willing to publish a book on Zarqawi as proposed by Miniter (and accepted by Regnery). *See* Regnery Post Hearing Brief ("Regnery Br.") at 6.

12 months preceding his demand for additional payment, Regnery paid Miniter $263,333 under the Publishing Contract. Regnery was within its rights to not "modify" the agreement and to insist that it would pay the remaining portion of the advance only upon delivery of the manuscript, as that is precisely what is called for in the Publishing Contract signed by Miniter.

Contrary to Miniter's assertions in his post hearing brief, Regnery has not breached any implied covenant of good faith and fair dealing, a claim and that, in any event, has been withdrawn by Miniter. *See* "Withdrawal of Counterclaim," filed herein on January 4, 2008. Regnery agreed to publish the Zarqawi book or, as show of good faith, offered to negotiate a buy-out agreement. *See* March 30, 2006 letter, Ex. 29. Miniter's agent, Mel Berger, then began to negotiate the terms of the buy-out agreement. Berger's agency, William Morris, is identified in the Publishing Contract as Miniter's agent. Contrary to Miniter's claim and based upon all prior dealings with Berger and standard industry practice and the clear terms of the contract signed by Miniter, both Ms. Ross and Mr. Carneal proceeded with Mr. Berger with the understanding that he represented Miniter's interests. There is no evidence to suggest that Regnery did not act in good faith in its efforts to negotiate a buy-out agreement with Berger.

Likewise, as Ms. Ross explained, Regnery rejected Miniter's proposal for a book about "Heroes" because it "was neither unique nor particularly compelling," but more importantly, because Regnery already had accepted Miniter's Zarqawi proposal. Ex. 29. Thus, Regnery did not "engineer a situation in which Miniter could not perform." Rather, Miniter "engineered" the situation by apparently not allocating any of his $263,333 advance to finance delivery of the second book.

III.    Regnery's Lost Profits Claim is Based on Relevant Data

Without any legal support, Miniter argues that evidence of Regnery's lost profits "is pure

speculation and guesswork with no basis whatsoever in grounded fact." To the contrary, Regnery has provided a detailed analysis of the profits on Miniter's three prior books published by Regnery. Under accepted contract principles, proof of a business' past profits is generally sufficient proof of lost future profits. *See Corbin on Contracts* § 56.20 (1993) (evidence of past expenditures and receipts sufficiently certain basis for damages for profits prevented); *Williston on Contracts* § 64:11 (4th ed. 1990) ("evidence of past profits earned may be used to provide a reasonable basis for calculating estimated future profits"). The evidence of past profits earned by Miniter's books provides "relevant data" for a "reasonable estimate" of lost profits.

     IV.   <u>Miniter's Mischaracterization of the Record Does Not Affect His Breach</u>

     Miniter's Post Hearing Brief contains various factual statements that are not supported by the evidence. While the misstatements do not affect the finding that Miniter is in breach, it is necessary to correct some of the egregious misstatements to avoid a misleading record. First, the $25,000 payment under the Publicity Expense Agreement (Ex. 2) is not "specific to royalties advanced for *Disinformation*." Miniter Br. at 2. On the contrary, that contract references the "publishing arrangements, as described in the Publishing Contract signed by Author on February 14, 2005" and no where in the Publicity Expense Agreement is there any reference assigning the advance to *Disinformation*. In making the Publicity Agreement, Regnery banked on the fact that they would have two opportunities to recover that additional advance – through publication of both books in their two-book deal with Miniter.

     Second, Miniter claims that he was compelled to hire a marketing consultant because a marketing plan was not prepared by Regnery. Miniter Br. at 2. Of course, Miniter's complaints about marketing are legally immaterial and do not justify his non-performance under the agreement. *See* Regnery Br. at 5. But the evidence in the record nevertheless shows that

Regnery met with Miniter's marketing consultant *before* any written marketing plan was even due to Miniter. Moreover, Ms. Ross testified extensively about Regnery's marketing strategy and performance for *Disinformation*. As evidenced by its track record of best sellers, it simply lacks credulity to assert that Regnery operates without marketing plans.

Third, Mr. Carneal never "rejected" the Zarqawi book. In fact, the undisputed evidence in the record establishes that Regnery "accepted" the Zarqawi proposal in January 2006. That Regnery would not agree to a modification of the contract to suit Miniter's needs does not amount to a *rejection* of the book. Regnery made clear at all times that it would publish the book under the terms of the Publishing Contract. *See, e.g.*, Ex. 29 (March 30, 2006 letter).

Finally, Miniter's statement that *Disinformation* will continue to earn royalties in the future is not accurate. Miniter Br. at 5. Ms. Ross testified that the royalties for *Disinformation* are actually decreasing as more unsold books are now returning from bookstores and distributors, as is typical when a current events book nears the end of its lifecycle.

<u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in Regnery's prior filings, Regnery requests a finding of breach of contract by Miniter and an award of $496,884.55 plus all fees and expenses paid by Regnery to the American Arbitration Association and prejudgment interest.

BAKER & HOSTETLER LLP

By:     */s/ Mark I. Bailen*
Bruce W. Sanford
Mark I. Bailen
Baker & Hostetler LLP
1050 Connecticut Ave, NW, Suite 1100
Washington D.C. 20036
(202) 861-1500
*Attorneys for Claimant*
*Regnery Publishing, Inc.*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Regnery Publishing, Inc.'s Reply Brief was

served via email on the following counsel on this 8th day of February, 2008.

> John M. Shoreman, Esq.
> McFadden & Shoreman
> 1420 New York Avenue, NW
> 7th Floor
> Washington, D.C. 20005

*/s/ Mark I. Bailen*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGNERY PUBLISHING, INC.,

                 Petitioner,

vs.

RICHARD MINITER,

                 Respondent.

CASE NO.:   1:08-cv-00709 (EGS)

## ORDER DENYING MOTION TO VACATE AND
## <u>GRANTING PETITION TO CONFIRM ARBITRATION AWARD</u>

Upon consideration of Petitioner Regnery Publishing, Inc.'s Petition to Confirm Arbitration Award regarding the March 10, 2008 award in *In the Matter of Arbitration between Regnery Publishing, Inc. and Richard Miniter*, AAA Docket No. 16 143 00290 07, Respondent's Motion to Vacate, the opposition thereto and any reply,  it is on this _____ day of _____, 2008,

      **ORDERED** that the Motion to Vacate is DENIED; it is further

      **ORDERED** that the petition is hereby GRANTED, and the March 10, 2008 arbitration award is CONFIRMED; and it is further

      **ORDERED** that the Clerk shall enter a judgment against Respondent Richard Miniter in the amount of $159,428.28, together with interest at the legal rate permitted under District of Columbia law from the date of the Award, plus the costs of this action.


Date: _____

                                     _____

                                     Judge Emmet G. Sullivan
                                     U.S. District Court Judge

Copies to:

Mark I. Bailen
Baker & Hostetler, LLP
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C. 20036
(202) 861-1500

*Attorney for Petitioner, Regnery Publishing, Inc.*

John M. Shoreman
McFadden & Shoreman, LLC
1420 New York Avenue, N.W.
Suite 700
Washington, D.C. 20005
(202) 638-2100

*Attorney for Respondent, Richard Miniter*